UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DELANEY BRYANT, BRIANNA LEMMON,
and VIOLET OSPINA, on behalf of themselves
and all others similarly situated,

                                    Plaintiffs,

                    -against-

BUFFALO EXCHANGE, LTD.,

                                    Defendant.

23-cv-8286 (AS)

<u>OPINION AND ORDER</u>

ARUN SUBRAMANIAN, United States District Judge:

   Plaintiffs Delaney Bryant, Brianna Lemmon, and Violet Ospina, individually and on behalf of all others similarly situated, allege that their former employer, clothing retailer Buffalo Exchange, violated the New York Labor Law by paying them biweekly instead of weekly. Plaintiffs move to certify a class of all current and former retail employees in Buffalo Exchange's New York locations. For the following reasons, the motion is DENIED.

## BACKGROUND

   Buffalo Exchange is a clothing retailer with five locations in New York. Dkt. 70-1 at 8:2–4, 9–13. It mostly sells used clothes, which it purchases directly from customers who bring items into the retail locations. *See* Dkt. 70-13 at 5; *see also* Dkt. 70-1 at 27:4–8 (explaining that twenty percent of merchandise is new). When a customer brings an item into the store that they want to sell, a "buyer" evaluates the item and decides whether to buy it and at what price. Dkt. 72-1 at 45:12–23.

   Buyers are just one type of retail employee at Buffalo Exchange. The company also hires floor assistants, floor security assistants, and cashiers. *See* Dkt. 70-13 at 16–17. Buyers are the only employees who are trained to work the "buy counter," where they make decisions about what clothes to purchase. Dkt. 72-6 ¶ 9. Buyers are also trained on the cash register. *Id.* ¶ 7. Cashiers work the cash register but not the buy counter. Floor assistants and floor security assistants do neither.

   Bryant and Lemmon worked as buyers at Buffalo Exchange's East Village location until September 2019 and October 2020, respectively. *See* Dkt. 29 ¶¶ 5, 7; Dkt. 75 at 2 n.1. Until November 2022, Ospina worked as a cashier at the store in Astoria, Queens, which has since closed. *See* Dkt. 29 ¶ 9; Dkt. 75 at 2 n.1.

   On September 19, 2023, plaintiffs sued Buffalo Exchange on behalf of a putative class of current and former New York retail employees. *See* Dkt. 1; *see also* Dkt. 29 (amended complaint).

Plaintiffs allege that by paying them biweekly, Buffalo Exchange violated section 191(1)(a) of the New York Labor Law, which provides that "[a] manual worker shall be paid weekly and not later than seven calendar days after the end of the week in which the wages are earned." N.Y. Lab. Law § 191(1)(a). After the close of discovery in September 2024, plaintiffs moved for certification of the class. Dkt. 68.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 23 governs class certification. "To maintain a class action, plaintiffs must demonstrate that '(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.'" *Elisa W. v. City of New York*, 82 F.4th 115, 122 (2d Cir. 2023) (quoting Fed. R. Civ. P. 23(a)). "These requirements are known as numerosity, commonality, typicality, and adequate representation." *Id.*

"In addition to satisfying these requirements, plaintiffs must . . . show that one of the three conditions of Rule 23(b) is met." *Id.* Here, plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members" and a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The plaintiff bears the burden of proving that Rule 23's requirements are satisfied by a preponderance of the evidence. *See In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013).

## DISCUSSION

### I.    Numerosity

Buffalo Exchange doesn't dispute that plaintiffs meet the numerosity requirement. "[N]umerosity is presumed at a level of 40 members," *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995), but evidence of "exact class size or identity of class members" is not required, *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). Here, Buffalo Exchange's payroll information shows that the putative class includes approximately 1,144 retail employees throughout Buffalo Exchange's New York store locations, Dkt. 70 ¶ 15, which easily surpasses the numerosity threshold.

### II.    Commonality and Predominance

"To satisfy commonality, plaintiffs must affirmatively demonstrate by a preponderance of the evidence that there are questions of law or fact common to the class." *Elisa W.*, 82 F.4th at 122–23. "[C]ommonality exists if there is a question such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). The related predominance requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's

case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 118).

Plaintiffs say there are two questions common to the class: (1) whether retail employees are manual workers, and (2) whether they were paid on a frequency that violates section 191(1)(a). Dkt. 69 at 12. Because there's no dispute that all potential class members were paid on a biweekly basis, this collapses into one question. If the retail employees are manual workers under New York law, then their pay schedule violates section 191(1)(a). In other words, there is only one "complex, disputed issue" in this case. *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010). The parties dispute whether this issue is capable of classwide resolution such that it satisfies the commonality requirement. *See Wal-Mart*, 564 U.S. at 350 (holding that for questions to satisfy the commonality requirement, they "must be of such a nature" as to be "capable of classwide resolution").

To qualify as a "manual worker" under New York law, employees must "spend more than 25 percent of their working time performing physical labor." *See Rankine v. Levi Strauss & Co.*, 674 F. Supp. 3d 57, 67 (S.D.N.Y. 2023) (quoting N.Y. Dep't of Labor Opinion Letter, No. RO-09-0066 (May 21, 2009)).[1] Buffalo Exchange argues that plaintiffs can't prove using common evidence that all retail employees spend more than twenty-five percent of their time performing the physical labor of maintaining the store because there is no formal policy to this effect, nor do plaintiffs provide "[s]ignificant proof" that a de facto policy exists. *See Wal-Mart*, 564 U.S. at 353 (alteration in original) (citation omitted).

The Court agrees. Plaintiffs say they've introduced enough evidence to prove that "[a]ll of Buffalo Exchange's Retail Employees, across each job role and store location, perform the physical work of maintaining the retail operation" for at least twenty-five percent of their working hours. Dkt. 69 at 2. This work includes cleaning the store, managing and organizing dressing rooms, carrying and distributing merchandise to and around the sales floor, and straightening, setting up, and arranging clothing racks and displays. *Id.* at 2–6. But plaintiffs' proposed class includes cashiers and buyers, whose primary duties are working the cash register and staffing the buy counter, respectively. Plaintiffs haven't presented sufficient evidence to show that Buffalo Exchange requires these employees—whose primary duties differ from those of other retail employees like floor assistants—to spend at least twenty-five percent of their time on "the physical work of maintaining the retail operation."

---

[1] The statute itself defines a manual worker as "a mechanic, workingman, or laborer." N.Y. Lab. Law § 190(4). The New York Department of Labor has interpreted this provision to include "employees who spend more than 25 percent of their working time performing physical labor." N.Y. Dep't of Labor Opinion Letter, No. RO-09-006 (May 21, 2009). Numerous courts in this district have held that this interpretation is entitled to deference, and the parties don't suggest otherwise. *See, e.g.*, *Balderramo v. Go N.Y. Tours Inc.*, 668 F. Supp. 3d 207, 228 (S.D.N.Y. 2023); *Carvente-Avila v. Chaya Mushkah Rest. Corp.*, 2016 WL 3221141, at *2 (S.D.N.Y. Mar. 1, 2016).

Plaintiffs' evidence consists of the named plaintiffs' declarations and deposition testimony, the testimony of Buffalo Exchange's Rule 30(b)(6) deponent, one declaration from a former manager, declarations from four former cashiers and/or buyers at the East Village store, the Buffalo Exchange employee handbook, the Buffalo Exchange employee training manual, an "essential functions" document, and the job descriptions of each retail employee. *See* Dkt. 70. None of this, together or separately, demonstrates that Buffalo Exchange had a de facto policy of requiring all retail employees at every New York store to spend at least twenty-five percent of their time on the physical labor of maintaining the store.

Start with the declarations from the four former cashiers and buyers. These have little probative value for multiple reasons. To start, they're out of date. Three of these employees left the East Village store in 2019, and the fourth left in 2020. *See* Dkt. 70-9 ¶ 1; Dkt. 70-10 ¶ 1; Dkt. 70-11 ¶ 1; Dkt. 70-12 ¶ 1. One of the declarants describes the "physical work" associated with the COVID-19 pandemic: "during the beginning of the COVID-19 pandemic, customers would drop off boxes of clothes to sell, and we were required to carry those boxes inside the store from outside." Dkt. 70-10 ¶ 3. It's not clear whether this practice continued beyond the start of the COVID-19 pandemic. Second, the declarations were "clearly composed by lawyers" with "statements obviously crafted to describe a position that . . . conform[s]" to the New York Department of Labor's definition of a manual laborer. *See Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 159 (S.D.N.Y. 2008). The declarations contain identical, conclusory statements, like "[m]y work at Buffalo Exchange was very physical," and "I spent at least 25 percent of my time at work on physical work." Dkt. 70-12 ¶¶ 9, 11; Dkt. 70-11 ¶¶ 10–11, Dkt. 70-10 ¶ 11; Dkt. 70-9 ¶ 9; *see also Damassia*, 250 F.R.D. at 160 (holding that declarations that were "in all material respects identical [to] one another" were not credible where they were "clearly composed by lawyers" and contradicted by deposition testimony). It's not clear from the declarations whether that "physical work" was the shared work of maintaining the store, or whether it was other physical work specific to the buyer or cashier roles, such as picking up each item of clothing for inspection at the buy counter and refolding it. Finally, the declarants all worked at a single store in New York—the East Village location. Plaintiffs don't explain why the declarants' experiences can be extrapolated to every store in New York. *See Myers*, 624 F.3d at 549 ("Plaintiffs do not contend that their own deposition testimony relating to their specific job duties is generalizable to station managers at other Hertz locations in New York[, n]or . . . did plaintiffs ever submit any evidence to the district court relating to station managers at Hertz locations other than Long Island . . . .").

Nor do Buffalo Exchange's corporate documents show that the company had a uniform practice of requiring all retail employees to spend twenty-five percent of their time on the same shared, physical tasks. Plaintiffs point to a document detailing the "essential functions" of cashiers, buyers, floor assistants, and floor security assistants. Dkt. 70-15. The document provides that the "physical demands" of the cashier role "may include" the ability to "stand or move around the store for up to an 8 hour day; to continuously straighten, sort, and distribute merchandise on the floor; to occasionally tag and hang merchandise; [and] to frequently lift and carry items up to 20 lbs. in weight and occasionally lift and carry up to 40 lbs. in weight." *Id.* at 2. Similarly, the

physical demands of the buyer role "may include" "[t]he ability to continuously tag, hang, distribute, and straighten merchandise; to move around the store at an efficient pace for up to an 8 hour day; [and] to frequently lift and carry items up to 20 lbs. in weight and occasionally lift and carry up to 40 lbs." *Id.* at 3. But as Jennifer Forster, Buffalo Exchange's HR Director testified, this document was "largely created to comply with the [Americans with Disabilities Act] and describes the . . . potential physical requirements that the job entails" and "is not intended to be a description of the job." Dkt. 70-1 at 21:1–22:3. The actual job descriptions provide that cashiers and buyers have distinct duties from floor assistants and floor security assistants. *See* Dkt. 70-16. The one duty all retail employees have in common according to these descriptions is providing "top notch customer service." *See id.* at 3.

Plaintiffs also point to the employee handbook, which provides that "[a]ll employees participate in all store cleaning tasks" and instructs employees to "[k]eep in mind your job requires a lot of physical movement" when deciding how to dress. Dkt. 70-13 at 29–30. Again, all this shows is that each employee is expected to do some physical labor. It doesn't show how much or what kind. The handbook also describes the role of each retail employee. *Id.* at 16. Like the publicly posted job descriptions, the internal job descriptions show that each role has distinct duties. *Id.* Moreover, the handbook describes four different tiers of the "buyer" role: buyer, buyer expert, buyer trainer, and buyer supervisor. *Id.* at 16–17. Entry-level buyers are responsible for "buying inventory from the public, running the cash register, customer service, working the floor and more." *Id.* at 16. "Buyer Experts" and "Buyer Trainers," meanwhile, are responsible for "all of the duties of the Buyer Specialist, along with additional responsibilities such as completing buying assignments, making presentations at Buy Meetings, and participating in or leading store work teams" or "mentoring new employees." *Id.* at 16–17. Buyer supervisors complete all these duties, but with even more "supervisory responsibilities." *Id.* at 17. If anything, this portion of the employee handbook hurts plaintiffs' case because it suggests that people in certain retail roles, like "Buyer Expert," "Buyer Trainer," or "Buyer Supervisor" spend less time than others on the physical work of maintaining the store and fill that time with other duties like leading meetings or mentoring new employees.

As for the employee training manual, plaintiffs say it shows that "new employees work with a trainer to complete modules and learn how to do a variety of tasks within the store," including "trainings about service on the sales floor, customer services, working in dressing rooms, keeping the sales floor looking good, theft prevention, and merchandising and displays." Dkt. 69 at 10; *see generally* Dkt. 70-14. Plaintiffs point out that "[a]side from the tasks that are specific to certain job titles, the training is consistent across job titles." Dkt. 69 at 10. But this is exactly the point: some tasks are specific to certain job titles. These differences undercut plaintiffs' efforts to show that at least twenty-five percent of every retail employee's working time is spent on the same shared tasks. Indeed, as Forster's testimony makes clear, every New York employee participates in the shared duties of straightening and organizing the merchandise racks, distributing merchandise to the sales floor, checking on and cleaning the dressing rooms, and cleaning the

store. Dkt. 70-1 at 90–91. But this doesn't mean that the employee will "have to do that duty every shift" or "every day." *Id.* at 92.

Plaintiffs' sole testimonial evidence from a manager suggesting that all employees are routinely assigned to spend at least twenty-five percent of their time on these tasks comes from Mina Brewer, a former store manager at the East Village and Chelsea locations. Dkt. 70-8 ¶ 1. Brewer says that "[a]ll hourly employees [at her stores] . . . shared many of the same responsibilities," and "[t]he majority of their time was spent on those shared responsibilities," which included "straightening and cleaning the sales floor, . . . running clothes between different areas of the store, . . . moving boxes throughout the stores[,] processing new merchandise, . . . and cleaning the store." *Id.* ¶¶ 4–5. Brewer also says that "[i]n a typical shift, all buyers, cashiers, floor assistants, and floor security assistants spent the majority of their time on physical tasks," and "[o]verall, they spent at least 25 percent of their time on physical work." *Id.* ¶ 9.

But plaintiffs' singular declaration to this effect is contradicted by Buffalo Exchange's nine declarations from former and current managers from multiple New York stores. Plaintiffs argue that the Court "should assign little weight" to these declarations because "[c]ourts recognize that the employer-employee relationship has a high potential for coercion, limiting the reliability of declarations submitted by employers in opposition to class certification." Dkt. 77 at 3. But the case plaintiffs cite in support is specific to the conditional certification process in the FLSA context, which is structured differently and has different evidentiary standards. *See Amador v. Morgan Stanley & Co. LLC*, 2013 WL 494020, at *8 (S.D.N.Y. Feb. 7, 2013) ("[C]ourts in this Circuit regularly conclude that [declarations from employers] do not undermine the plaintiffs' showing in the first stage of the conditional certification process," which requires only a "modest factual showing" (citations omitted)). In determining whether to certify a class under Federal Rule of Civil Procedure 23, the Court must "must 'assess all of the relevant evidence.'" *Haley v. Teachers Ins. & Annuity Assoc. of Am.*, 54 F.4th 115, 123 (2d Cir. 2022) (quoting *In re I.P.O. Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006)). Here, that includes defendants' declarations, even if they "carry within them possible pressure arising from ongoing employment relationships." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1061 (N.D. Cal. 2007).

These declarations show that managers routinely exercise their discretion to assign certain types of employees less time on these shared, physical tasks. For example, one manager explained that "[s]tore manager[s] almost always assign senior-level Buyers for more time at the Buy Counter than junior Buyers," and "[d]epending on the store, time of year, day of week, and customer flow, store managers may assign experienced Buyers to spend up to 75% of their shifts or even more at the Buyer Counter or register, depending on store needs." Dkt. 72-3 ¶¶ 8, 12. Managers also sometimes designate "primary" cashiers, who "could be assigned six hours or even more per shift on the registers depending on the stores' needs." *Id.* ¶ 9. Additionally, managers designate buyers or cashiers as "In-Charge" (IC) for a particular shift, which means that those employees are "typically rotated through additional duties that include cash management, overseeing the registers, and providing guidance and training to other employees working at the registers." Dkt. 72-7 ¶¶ 8–9; *see also* Dkt. 72-3 ¶ 17. "An employee on IC duty may spend around

6

two hours of a shift at the register outside of any scheduled register duty they may be assigned for the day." Dkt. 72-5 ¶ 19; *see also* Dkt. 72-10 ¶ 10 ("Employees assigned cashier or 'In Charge' duties for the day typically spend no more than 10 to 20 minutes of their shifts cleaning because they use that time to count money and put cash in the store's safe.").

The gist of these declarations is that managers at different stores exercise their discretion in different ways. Brewer's declaration doesn't say otherwise. In fact, she confirms that "Buffalo Exchange's store managers assign employees to cycle through various tasks throughout their shifts." Dkt. 70-8 ¶ 3. While Brewer might have assigned all the employees at her stores to spend at least twenty-five percent of their time on the same tasks, nothing in her declaration suggests that there was a company-wide policy to this effect.

Plaintiffs say that "even when Retail Employees are assigned to the counter or cash register, much of their work involves physical labor, such as lifting boxes of clothing or pushing carts of clothing." Dkt. 77 at 2–3; *see* Dkt. 70-8 ¶ 13 ("While working at the buy counter, buyers were still doing extensive physical work," such as "pick[ing] up the clothes that customers bring in," "lift[ing] up and inspect[ing] every item of clothing, and then refold[ing] every item of clothing."). That may be true. But whether these tasks make buyers who spend most of their time behind the buy counter "manual laborers" is a separate inquiry. Answering this question won't resolve the liability issue for the whole class, which includes floor assistants, floor security assistants, and cashiers, none of whom spend any time behind the buy counter. The same goes for manning the cash register: some retail employees are never assigned to do it, while others spend most of their time there.

In sum, this is not a case where the class members all perform a "mix of a similar set of duties" and experiences vary only "at the margins." *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408, 419, 421 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3, 6 (2d Cir. 2015). Although all employees spend at least some time on the sales floor and on cleaning the store, some class members *never* perform certain duties—working the cash register or purchasing clothes from customers. This difference is material because the evidence shows that managers at each store can and do assign employees to these tasks at their discretion. Without more than anecdotal evidence that employees are always assigned to spend at least twenty-five percent of their time on the same tasks, the liability inquiry cannot be resolved on a classwide basis.

Plaintiffs argue that other courts in this circuit have certified classes seeking damages under section 191(1)(a) based on similar evidence. *See* Dkt. 69 at 14. Not so. In *Beh v. Community Care Companions*, 2022 WL 5039391 (W.D.N.Y. Sept. 29, 2022), the court held that the plaintiffs' "untimely wage payment claims are readily subject to generalized proof" because the "liability question" of whether home healthcare workers were manual workers could "be resolved on a class wide basis." *Id.* at *14. There, "[p]laintiffs ha[d] alleged, and the record before the Court d[id] not contradict, that all purported class members employed as home care workers performed substantially the same duties and tasks." *Id.* The same isn't true here; the record shows (and Buffalo Exchange argues) that many members of the class spend most of their time performing duties that others do not. In *Valdez v. Michpat & Fam, LLC*, 2022 WL 1085465 (E.D.N.Y. Jan. 2, 2022), each

employee spent "90% of his or her time" on "manual work," including "preparing and serving food, receiving deliveries, working the cash register, and cleaning the restaurant." *Id.* at *8. Unlike this case, in *Valdez* there was no evidence that any subcategory of employee spent most of their time on tasks that others weren't allowed to do.

Nor do plaintiffs' class certification cases outside of the section 191(1)(a) context move the needle. In a series of cases, courts have held that minor variations in job duties do not prevent the certification of a class of employees challenging the legality of their classification as exempt from overtime wage protections. But whether an employee is properly classified as exempt depends on whether their "primary duty" is management or administration. *See Jacob*, 289 F.R.D. at 418 n.5. So as Buffalo Exchange points out, "the legality of [the] pay practices [in those cases] could be determined through a single, *qualitative* assessment." Dkt. 75 at 16.

In *Jacob v. Duane Reade*, for example, the court certified a class of assistant store managers (ASMs) who argued that Duane Reade violated the New York Labor Law by classifying them as exempt. 289 F.R.D. at 410–11. Duane Reade argued that this question could not be determined on a classwide basis based on variation in the ASMs' duties by store, as well as the fact that store managers had discretion to assign ASMs to different tasks. *See id.* at 421. The court disagreed, holding that there was "no record evidence to suggest that [store managers'] discretion fundamentally changes the primary duties" of an ASM, and the introduction of certain remodeled stores altered their duties only "marginally." *Id.* The court held that "weight of the evidence tends to show that all ASMs share similar primary job responsibilities, and also have a similar understanding of their role in the [Duane Reade] organization." *Id.* at 419. As the Second Circuit explained in affirming the order, this included "evidence showing that . . . Duane Reade ASMs carry out their duties pursuant to a uniform policy, uniform training, and uniform procedures across all stores," as well as testimony from Duane Reade's former director of training and development establishing the ASMs have "similar baseline responsibilities from store to store." *Jacob v. Duane Reade, Inc.*, 602 F. App'x 3, 6 (2d Cir. 2015).

Similarly, in *Wood v. Mike Bloomberg 2020, Inc.*, 746 F. Supp. 3d 185 (S.D.N.Y. 2024), the court certified a class of campaign organizers who challenged their exempt classification because the parties agreed that the class members "spent the majority of their time contacting voters through phone calls and door-to-door canvassing." *Id.* at 196. The court held that minor variations in how class members carried out those duties—i.e., either by reading a script or relying on a "personal story" to connect with voters—had no bearing on whether the class members were properly classified as exempt. *Id.*

In these cases, minor variations among class members' duties were immaterial to the question at issue: whether the class members' *primary* duties were administration or management. This is a qualitative question that can be answered on a classwide basis if plaintiffs submit sufficient evidence to conclude that class members have "largely consistent duties." *Jacob*, 289 F.R.D. at 415.

Here, the inquiry is different. The manual-worker inquiry requires a quantitative assessment of how much time each class member spends on certain tasks. There is no formal policy requiring that retail employees spend at least twenty-five percent of their time cleaning and straightening the store. Plaintiffs have submitted only anecdotal evidence suggesting that some employees at some locations spend this amount of time on these tasks. *See Lanqing Lin v. Everyday Beauty Amore Inc.*, 2019 WL 3037072, at *2 (E.D.N.Y. July 11, 2019) (rejecting argument that "five affiants' statements about their own personal employment experiences" was sufficient to establish company policy). In response, defendants have submitted evidence that the amount of time spent on any task varies from store to store and based on managerial discretion, and that at least some members of the class spent at least seventy-five percent of their time on tasks that other class members never do. These variations mean that whether class members are manual workers cannot be resolved "in one stroke," *Wal-Mart*, 564 U.S. at 350, and so commonality is not met.

For the same reason, the predominance requirement is not satisfied. Trial would be dominated by individualized inquiries into how much time each employee at each Buffalo Exchange location spends on certain tasks. This issue is far more substantial than any that could conceivably be resolved by generalized proof, such as whether certain tasks that the employees were asked to do constitute physical labor. Accordingly, even if common questions exist that can be resolved on a classwide basis, these do not predominate over the issues that must be resolved through an individualized inquiry. And because commonality and predominance are not satisfied, the Court need not address whether the separate requirements of typicality, adequacy, and superiority are satisfied.

## CONCLUSION

For these reasons, plaintiffs' motion to certify the class is DENIED without prejudice. To the extent that plaintiffs believe they can satisfy the certification requirements for a subclass of retail employees across locations or at a particular store, they may submit a motion to that effect by October 24, 2025, with opposition briefing due November 7, 2025, and the reply due November 14, 2025.

The Clerk of Court is directed to terminate Dkt. 68.

SO ORDERED.

Dated: August 28, 2025
New York, New York

ARUN SUBRAMANIAN
United States District Judge